**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRUCE BOICE,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY,** | : | **NO. 05-4772** |
| | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM AND ORDER</u>**

GENE E.K. PRATTER, J.                                    OCTOBER 5, 2007

Plaintiff Bruce Boice has filed a Complaint pursuant to Title VII of the Civil Rights Act 1964, as amended, 42 U.S.C. § 2000e, <u>et seq.</u> ("Title VII"), 42 U.S.C. § 1981; the Pennsylvania Human Relations Act, 43 Pa. C.S. § 959, <u>et seq.</u> ("PHRA"); and the Americans with Disabilities Act, 42 U.S.C. § 12101, <u>et seq.</u> ("ADA"), against the Southeastern Pennsylvania Transportation Authority ("SEPTA"). He claims that SEPTA 1) terminated his employment as a maintenance manager based on his race and 2) failed to accommodate his disability during the term of his employment.

Presently before the Court is SEPTA's Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Motion with respect to the alleged racial discrimination in Counts I, II and IV and will deny the Motion with respect to the alleged disability discrimination in Count III .

I.      **FACTUAL BACKGROUND**

SEPTA[1] provides public transportation services in the Bucks, Chester, Delaware, Montgomery and Philadelphia Counties in Pennsylvania.  (Statement of Undisputed Facts ("SUF") ¶ 1.)  In connection with its services, SEPTA operates vehicle maintenance and repair facilities throughout the greater Philadelphia area.  (Ex. A to Mot. for Summ. J., Declaration of Eric Thornhill ("Thornhill Decl.") ¶ 2.)  The employment structure of each maintenance facility is as follows: (1) a director of maintenance oversees and operates each facility; (2) an assistant director of maintenance reports to the director and assists with supervisory responsibilities; (3) several maintenance managers oversee safety and on-time service by managing the employees and mechanics who repair buses; and (4) additional employees, including mechanics, repair SEPTA vehicles.  (SUF ¶¶ 3-7, 9.)

In 1989, SEPTA hired Mr. Boice, a Caucasian male, as a maintenance manager in its Berridge maintenance facility. (SUF ¶ 8.)  Although he was transferred from time to time among SEPTA facilities, Mr. Boice continuously worked as a maintenance manager throughout his 14-year tenure with SEPTA.

At several different points in his career, Mr. Boice worked with Eric Thornhill, an African-American SEPTA employee.  Beginning in 2000, Mr. Thornhill directly managed Mr. Boice at SEPTA's Callowhill facility, where Mr. Thornhill served as an assistant director.  Mr. Boice next served under Mr. Thornhill's supervision at SEPTA's Allegheny facility. (SUF ¶ ¶

---

[1] Under Pennsylvania law, SEPTA is a public employer.  See 43 P.S. § 1101.301 et seq.

10,11.)[2]  However, the main events giving rise to Mr. Boice's claims of "reverse" racial discrimination occurred during his employment at the Victory maintenance facility.

In 2002, Mr. Thornhill was serving as the director of maintenance at SEPTA's Victory bus garage ("Victory"). The assistant director, Bob Hilsee, a Caucasian male, suggested to Mr. Thornhill that Mr. Boice be transferred to Victory due to his expertise in SEPTA's Vehicle Maintenance Information System ("VMIS").[3]  Mr. Thornhill agreed, and the record shows that Mr. Thornhill believed that Mr. Boice would be an asset to the facility, specifically because of his ability to solve certain technical problems SEPTA had with its fuel lanes.  (Ex. F to Mot. for Summ. J.Hilsee Dep. 28); (Ex. B to Mot. for Summ. J., Thornhill Dep. 107-108.) Accordingly, SEPTA transferred Mr. Boice to the Victory facility.

From 2002 until his termination in August 2003, Mr. Boice worked under the direct supervision of three different assistant directors of maintenance.  First, Mr. Hilsee supervised Mr. Boice.  When Mr. Hilsee left Victory, Mr. Thornhill accepted the role of acting assistant director while continuing in his role as director of maintenance.  A few months later, SEPTA hired Maurice Bolduc, a Caucasian male, to fill the position of assistant director, a position that entailed directly supervising Mr. Boice and the other maintenance managers.  (SUF ¶ 13.)  Out of the five maintenance managers who served at Victory with Mr. Boice, four are Caucasian, and since 2002, all but one maintenance manager at Victory has been Caucasian.  (SUF ¶¶ 92, 94.)

_____

[2]When Mr. Boice transferred to Callowhill, Mr. Thornhill was the assistant director of maintenance at Callowhill, and Joe Brennan, a Caucasian male, was the director of maintenance. (SUF ¶ 10.)

[3]VMIS is a computerized system that allows SEPTA to track the maintenance work being performed on SEPTA buses.  (SUF ¶ 12.)

Mr. Boice alleges he experienced discrimination because of his race and his disability while working at the Victory facility. Mr. Boice testified that while at Victory, Mr. Thornhill often used profanity, though his obscenities did not include racial slurs. (Ex. D to Mot. for Summ. J., Boice Dep. 72-73).  Mr. Boice alleges Mr. Thornhill directed profanity only toward Caucasian employees, but SEPTA disputes this allegation. Although Mr. Thornhill was not the only member of the Victory crew to use obscene words during the workday, id. at 73, Mr. Boice took particular note of instances where Mr. Thornhill told him to "get the 'F' out of here" or "get out of my office," as well as one instance where Mr. Thornhill allegedly told Mr. Boice that he "didn't care about [Mr. Boice's] 'F''ing disability." Id.

After Mr. Boice began to work at Victory, Mr. Thornhill stopped allowing Victory employees to park between the two buildings where SEPTA stored its spare tires, an area close to the facility's entrance. Mr. Thornhill does not recall ever having a conversation directly with Mr. Boice about parking, but does remember informing all of the maintenance managers to stop parking in that particular area.  (SUF ¶ 101; Ex. B to Mot. for Summ. J., Thornhill Dep. 23)  Mr. Boice, however, testified that when he approached Mr. Thornhill to ask for a handicapped spot to replace the convenience of the alley parking, Mr. Thornhill said that there were no handicapped spots.  (Ex. D to Mot. for Summ. J., Boice Dep. 40-41, 49.)  Nevertheless, when Mr. Boice was asked during his deposition whether he needed to park close to the shop due to his diabetes, he replied, "That's where every foremen [sic] parked." Id. at 151.

At the end of January 2003, Mr. Thornhill informed Mr. Boice that he (Boice) was being rescheduled from the daytime shift to the relief shift.  Id. at 51. Mike Heim, a Caucasian maintenance manager, assumed Mr. Boice's daytime shift.  Id.  Mr. Boice complained to Mr. Thornhill about his shift change, explaining that the former assistant director, Mr. Hilsee, had

allowed him to work the day shift because regular, daytime work hours allowed him to maintain

a proper and steady course of medication to treat his diabetes.  Id. at 53.  To this, Mr. Thornhill

allegedly replied "F Mr. Hilsee.  You'll do what I 'F''ing tell you."  Id.  Despite this response,

Mr. Boice did not use SEPTA's internal processes to file a formal request for an

accommodation, nor did he submit medical documentation of his need for an accommodation.[4]

(SUF ¶ 105-108.)

Mr. Boice alleges Mr. Thornhill targeted him for disciplinary infractions because of his

race. However, the record indicates that Mr. Boice engaged in misconduct on multiple occasions

throughout his career with SEPTA.  Prior to Mr. Boice's transfer to Victory, various supervisors,

both African-American and Caucasian, had disciplined Mr. Boice for altercations with co-

workers as well as failure to adequately perform his duties. In January 1994, Mr. Boice's then-

supervisor, Ken Strack, a Caucasian male, noted in a "Supervisor's Special Report" in Mr.

Boice's file that he had disciplined (and counseled) Mr. Boice for "screaming at an employee."

(SUF ¶ 18.)  In January 1998, Mr. Boice complained to Emille Williams, an African-American

male who was then director of maintenance, that assistant director Larry Moore, also a African-

American male, had misallocated overtime work by failing to consider Mr. Boice's seniority.

(SUF ¶ 20.)  During his conversation with Mr. Williams, Mr. Boice allegedly made threatening

remarks, including telling Mr. Williams that he would "fix [them] and this time he [would] win."

(SUF ¶ 21.)  Following the incident, he filed an internal compliant against Mr. Moore for racial

discrimination in the allocation of overtime hours.  (SUF. ¶ 22.)   After an investigation,

_____

[4]Mr. Boice testified that he did schedule and attend an appointment with the Equal Employment
Opportunity Commission ("EEOC") to file a complaint about his shift change, but that the
complaint was not filed until after his termination.  (Ex. D to Mot. for Summ. J., Boice Dep. 57.)

SEPTA's EEO/AA Department dismissed the complaint for lack of probable cause.  (SUF. ¶ 23.)[5]

In January 1999,[6] Joe Grostas, a Caucasian male, disciplined Mr. Boice for failing to fulfill his job duties.  After speaking with Mr. Boice about general employee productivity and that of Mr. Ercolono, an employee under Mr. Boice's command, Mr. Grostas found Mr. Ercolono wandering the halls of the shop rather than working.  When Mr. Grostas confronted Mr. Boice about his responsibility to ensure that Mr. Ercolono performed his duties, Mr. Boice allegedly replied: "I am not being paid to chase people around."  (SUF ¶ 24; Ex. L to Mot. for Summ. J., Grostas Memo.)  Mr. Grostas recommended discipline, and as a result, John Merrigan, the Caucasian director of maintenance, imposed a ten-day suspension against Mr. Boice.  (SUF ¶ 25.)  Mr. Merrigan cited insubordination, willful misconduct and conduct unbecoming a SEPTA employee as impetus for the discipline.  Id.

While Mr. Boice was working under the supervision of Mr. Thornhill at the Callowhill facility in October 2000, Mr. Boice was suspended for 15 days for non-productivity and failing to properly manage employees under his direct supervision.  (SUF ¶ 26.)  Joe Brennan, a Caucasian director of maintenance, administered the suspension, (Ex. N to Mot. for Summ. J., Brennan Suspension.), but Mr. Thornhill was responsible for observing, documenting and preparing a "write-up" of Mr. Boice's  offenses.  (SUF ¶ 27.) Mr. Boice filed a grievance with his union as a result of the discipline, and through the grievance process, James Jamison and

---

[5]However, the investigation did reveal allegations, supported by several employees, that Mr. Moore used the term "cracker" quite frequently.  (Ex. K to Mot. for Summ. J., Case Investigation Report.)

[6]At this time Mr. Boice worked at SEPTA's Comly facility.  (SUF ¶ 24.)

Joseph Quinn, SEPTA's labor relations managers (both Caucasian males), reviewed and upheld the discipline Mr. Brennan had administered.  (SUF ¶¶ 28-29.)  However, the suspension was ultimately overturned at arbitration.  (SUF ¶ 30.)

Mr. Boice's disciplinary problems continued at Victory. In November 2002, Mr. Thornhill issued a warning letter and a four-day suspension to Mr. Boice.  Mr. Thornhill based the suspension on reports by then-assistant director Mr. Hilsee (a Caucasian male), that Mr. Boice had placed buses into service with wheels that needed to be tightened and with insufficient fuel to complete their routes.  (SUF ¶ 32.) When Mr. Boice filed a grievance regarding the discipline, Lou Curley, a Caucasian male and chief bus operations maintenance officer at Victory, presided over the hearing and upheld the suspension.  (SUF ¶¶ 34, 35.) After Mr. Boice served  two days of the suspension, his union settled the grievance and reduced the remainder of the suspension to a written warning.  (SUF ¶ 36.)

On July 14, 2003, Mr. Boice again was criticized for deficient performance.  Mr. Boice's immediate supervisor, assistant director Maurice Bolduc met with Mr. Boice to discuss the problems.  (SUF ¶ 37.)  Mr. Bolduc identified specific areas in which Mr. Boice needed improvement, including outbound delays, VMIS violations, availability of buses, completion of necessary repairs, failure to provide employees lunch breaks, and problems with bus parts.  Id.

A final disciplinary issue arose in early August 2003.  Mr. Bolduc reported to Mr. Thornhill that he had discovered two "A cards" protruding from the bottom of Mr. Boice's locker in violation of SEPTA's policy that such cards be filed in the appropriate bus's file.[7]  (Ex.

---

[7]An "A card" is a SEPTA work order.  The front side of the card lists the items that need to be inspected for a particular vehicle.  (Ex. C to Mot. for Summ. J., Bolduc Dep. 37.)  The mechanic assigned to the inspection is to go through the checked items on the front side of the card, and write on the back of the card any defects found during the inspection.  Id.  The mechanic then

B to Mot. for Summ. J., Thornhill Dep. 72.)  Mr. Bolduc and Mr. Thornhill retrieved the two

protruding A cards from the locker. Id.  After informing Mr. Boice of the discovery, Mr.

Thornhill and Mr. Bolduc inspected his locker and found four more A cards.  (SUF ¶ 41.)  The

discovery of the A cards revealed that safety-sensitive repairs were not completed even though

Mr. Boice was responsible for ensuring that such repairs had been completed and properly

documented.  (SUF ¶ 42.) Because the repairs were safety-sensitive and Mr. Boice had released

arguably dangerous vehicles on the roadways, Mr. Thornhill recommended that SEPTA

terminate Mr. Boice.  (SUF ¶ 42.)

      In an "Imminent Discharge" letter dated August 12, 2003, SEPTA detailed the violations

forming the basis for Mr. Boice's termination.  The letter included the A card violations as well

as instances of poor performance, including: Mr. Boice's failure to avoid delays in service by

contacting alternate bus depots to obtain loaned buses as substitutes for broken buses at the

Victory facility; Mr. Boice's release of a bus into revenue service with a faulty "turbo charger"

despite the fact that the bus was on hold until that repair could be made; Mr. Boice's failure to

conduct mandatory "wheel torques" to tighten the wheels on the buses; Mr. Boice's failure to

comply with SEPTA's ADA policy and internal procedures for repairing wheelchair lifts; Mr.

Boice's permitting employees to work through lunch in violation of SEPTA policy; and Mr.

Boice's reprimand of another manager in front of the staff.  (Ex. T to Mot. for Summ. J.,

Imminent Discharge Letter.)

---

returns the card to the maintenance manager, who acknowledges that all necessary repairs are
complete, signs the card and places the bus back into service by completing the work order on
the VMIS system. (SUF ¶ 40.)

After Mr. Boice's union filed a grievance protesting his discharge, SEPTA held a formal hearing where Mr. Boice was represented by the union president and business agent.  (SUF ¶¶ 44, 45.)  The union argued that Mr. Boice was victimized by his supervisor, Mr. Thornhill, and that his actions were no different than those of other maintenance managers.  (SUF ¶ 47.)  After hearing evidence from both parties, James Hathaway, the chief officer presiding, upheld Mr. Boice's discharge, finding SEPTA's evidence in support of the discharge to be "overwhelming." (SUF ¶ 48.)  Mr. Hathaway is a Caucasian male.  Id.

Mr. Boice appealed to the Labor Relations department, and James Jamison, the Caucasian manager of the department, upheld the discharge.  (SUF ¶ 49.)  The grievance proceeded to arbitration,[8] where Mr. Boice alleged that his discharge occurred because of his race.  (SUF ¶ 52.)  During the arbitration hearing, Mr. Boice insisted that the A cards had been planted in his locker by Howard Crane, who was angry with him over reprimands for tardiness. (SUF ¶ 58.)  The arbitrator found Mr. Boice's arguments unpersuasive and determined that Mr. Boice breached an important supervisory responsibility.  (SUF ¶¶ 60-62.)  The arbitrator rejected Mr. Boice's allegation that he was terminated due to his race. He issued a written decision stating that SEPTA had just cause to discipline Mr. Boice because he had committed several significant offenses.  (SUF ¶ 53.) Nevertheless, the arbitrator ruled that SEPTA did not have just

---

[8]SEPTA's grievance process was derived from a Memorandum of Understanding between SEPTA and the Union.

cause to terminate Mr. Boice and should reinstate Mr. Boice with a six-week suspension.[9]  (Ex. U to Mot. for Summ. J., Arbitrator's Opinion 32); (SUF ¶ 63.)

SEPTA filed a petition to vacate the arbitration award in the Court of Common Pleas of Philadelphia County.  (SUF ¶ 64.)  That court agreed with the arbitrator.  However, the Commonwealth Court of Pennsylvania reversed the decision, holding that the arbitrator's award deprived SEPTA of its ability to fulfill its essential function, namely providing safe and reliable bus transportation.  See SEPTA v. Transport Workers Union of America, Local 290, 880 A.2d 731, 737 (Pa. Commw. Ct. Aug. 11, 2005).  SEPTA's official termination of Mr. Boice was dated August 9, 2003.  SEPTA later replaced Mr. Boice with another Caucasian employee.  (Ex. A to Mot. for Summ. J., Thornhill Decl. ¶¶ 7-8.)

On July 7, 2004, the Department of Veteran Affairs designated Mr. Boice 100% disabled and unable to work as of August 9, 2003, the last day he worked for SEPTA.  (Ex. DD to Mot. for Summ. J., Veteran Affairs Rating Decision).  Mr. Boice's disability status affords him certain benefits, including: free medical care, medical insurance for his children, and college tuition benefits.  (SUF ¶ 111.)  Based upon the VA's finding that he was 100% disabled, on September 9, 2004,  Mr. Boice applied for and was granted Social Security disability benefits.  (SUF ¶ 112.)[10] Based upon the questionnaire and supporting documentation, the Social Security

---

[9]The crux of the arbitrator's finding of lack of just cause was that discipline at SEPTA must be progressive and corrective, and not punitive.  While Mr. Boice had been disciplined for other offenses, the arbitrator noted that he was never given any disciplinary suspension for negligent performance of job duties. It also appears that did the arbitrator did not believe that Mr. Boice was given sufficient notice that termination was impending. (Ex. U to Mot. for Summ. J., Arbitrator's Opinion 31.)

[10] In the Social Security questionnaire, among other things, Mr. Boice claimed the following:
- "I can no longer lift myself out of the tub, trim my toenails, nor [sic] button shirts."
- "Moved out of my trailer because I could no longer maintain the lawn."

Administration granted Plaintiff $1,806 per month in benefits. His continued entitlement to the benefits depends on his continued inability to work.  (SUF ¶ 116.)

On October 14, 2003, Mr. Boice filed a Charge of Discrimination with the EEOC alleging race discrimination and disability discrimination by SEPTA.  (SUF ¶ 66.)  Mr. Boice asserted that Mr. Thornhill recommended his termination because he is Caucasian.  He alleged that Mr. Thornhill failed to accomodate his disability by altering Mr. Boice's shifts from daytime work to relief work and prohibiting him from parking in a spot close to the Victory facility.  (SUF ¶¶ 67-68.)[11]

On June 8, 2005, the EEOC issued Mr. Boice a Notice of Right to Sue. (Complaint ¶12(b)).  Mr. Boice filed the present action on September 6, 2005.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby,

_____

        •     "I get shortness of breath while doing any physical labor."
        •     "I can sit for about 15-20 minutes before the pain in my hips and back begin and I stiffen up."
        •     "I can't hold onto things because I have a weak grip.  I can't feel heat or cold at first."
(SUF ¶ 113.)
[11]Mr. Boice never filed an internal complaint of race or disability discrimination, (SUF ¶ 69), although he was aware of SEPTA's policy against discrimination and its process for handling complaints.  (SUF ¶¶ 71-73.)

Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The Court must avoid making credibility judgments based upon the various depositions in the record. Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006) (noting that credibility determinations that underlie findings of fact are appropriate to a bench verdict but not to a ruling on summary judgment). Nevertheless, the non-moving party must present materials "as would be admissible in evidence." Holt Cargo Sys., Inc. v. Delaware River Port Authority, 20 F.Supp.2d 803, 839 (E.D. Pa. 1998).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## III.   DISCUSSION

### A.   Race Discrimination Under Title VII, Section 1981,[12] and the PHRA[13]

Mr. Boice argues that SEPTA's decision to terminate his employment constituted

"reverse" racial discrimination in violation of Title VII.[14]  The Court applies the burden-shifting

analysis developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to claims of

reverse racial discrimination.[15]  Hadley v. City of Plainfield, 169 F. App'x 670, 672 (3d Cir.

---

[12]The Court does not determine whether a viable cause of action may be asserted against SEPTA under 42 U.S.C. § 1981. See Poli v. SEPTA, 1998 WL 405052, at *10-12 (E.D. Pa. Jul. 7, 1998) (discussing the split of authority regarding whether an independent cause of action exists under § 1981).  Claims brought pursuant to Section 1981 are analyzed under the same framework as Title VII claims.  Kelly v. Drexel Univ., 94 F.2d 102, 104-105 (3d Cir. 1996). Therefore, even assuming that Mr. Boice may assert the § 1981 claim, it would fail for the same reasons as his Title VII claim.

[13] The Court will address Counts I and IV jointly because Title VII and PHRA claims are evaluated under the same standard. Russell v. Strick Corp., No. 97-806, U.S. Dist. LEXIS 9562 at *8 (E.D. Pa. 1997).

[14]While the Complaint alleges adverse employment actions aside from his termination, including demotion (Compl. ¶ 16), in his deposition Mr. Boice stated that he was never demoted (Ex. D, to Mot. for Summ. J., Boice Dep. 72.)

[15]Intentional discrimination in employment cases falls within one of two categories: "pretext" cases and "mixed-motives" cases. See Price Waterhouse v. Hopkins, 490 U.S. 228, 247 n.12 (1989) (plurality). In pretext cases, the McDonnell Douglas / Burdine analysis applies. In a mixed-motive case, by contrast, the plaintiff "has the burden of showing by evidence tied to a discriminatory animus that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992) (citing Price Waterhouse, 490 U.S. at 258). Mr. Boice has not produced direct evidence of racial animus, so the Price Waterhouse analysis will not apply. Mr Boice alleges that Mr. Thornhill used profanity in the presence of Mr. Boice and other Caucasian employees, but not, to Mr. Boice's knowledge, in the presence of African-American employees. (Ex. D to Mot. for Summ. J., Boice Dep. 73). Even if the Court interprets this disputed fact in favor of Mr.

-13-

2006). Under this analysis, Mr. Boice must first establish a *prima facie* case of discrimination. <u>Texas Dept. Of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-253 (1981). To establish a *prima facie* case of race discrimination, Mr. Boice must show the following by a preponderance of the evidence: (1) he is a member of a protected class, (2) he was qualified for the former position, and (3) he was subject to an adverse employment action, (4) that, under the circumstances, gave rise to an inference of discrimination. <u>Verdin v. Weeks Marine Inc.</u>, 124 F. App'x 92, 95 (3d Cir. 2005) (citing <u>Goosby v. Johnson & Johnson Med., Inc.</u>, 228 F.3d 313, 318-19 (3d Cir. 2000)). "The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that [P]laintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination *could* be a reason for the employer's action." <u>Coulton v. Univ. of Pa.</u>, 2006 WL 759701 at *5 (E.D. Pa. Mar. 21, 2006) (quoting <u>Marzano v. Computer Science Corp.</u>, 91 F.3d 497, 508 (3d Cir. 1996)).

If Mr. Boice succeeds in establishing the *prima facie* case, the burden shifts to SEPTA to articulate some legitimate, nondiscriminatory reason for the adverse employment action. <u>Burdine</u>, 450 U.S. at 252-253. If SEPTA offers some evidence of a legitimate, non-discriminatory reason for its actions, then Mr. Boice must show that SEPTA's stated reason was mere pretext. Mr. Boice must do this by pointing to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than

---

Boice, Mr. Thornhill's use of profanity cannot be viewed as directly reflecting a discriminatory attitude, particularly in light of Mr. Boice's admission that he was never subjected to racial slurs. (Ex. D to Mot. for Summ. J., Boice Dep. 72.) <u>See e.g.</u>, <u>Taylor v. Proctor & Gamble Dover Wipes</u>, 184 F.Supp.2d 402, 413 (D. De. 2002) ("[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate, are considered sufficient to constitute direct evidence of discrimination.").

not a motivating or determinative cause of the employer's action." <u>Iadimarco v. Runyon</u>, 190

F.3d 151, 166 (3d Cir. 1999) (<u>quoting</u> <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994)).  The

ultimate burden of persuading the trier of fact that SEPTA intentionally discriminated against

Mr. Boice is at all times his.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506-07 (1993).

### I. The *Prima Facie* Case

SEPTA does not dispute that Mr. Boice has shown that he is a member of a protected

class, or that its decision to terminate Mr. Boice constitutes an adverse employment action.

However, SEPTA asserts that Mr. Boice has failed to present a *prima facie* case of race

discrimination because he has not shown that he was discharged under circumstances that give

rise to an inference of discrimination. A plaintiff alleging "reverse" racial discrimination may

establish an inference of discrimination under Title VII by "presenting sufficient evidence to

allow a reasonable fact-finder to conclude (given the totality of the circumstances) that the

defendant treated the plaintiff 'less favorably than others because of [his] race, color religion,

sex or national origin.'" Iadimarco, 190 F.3d at 163 (quoting Furnco Constr. Corp. v. Waters,

438 U.S. 567, 577 (1978)).

Mr. Boice contends that his termination raises an inference of racial discrimination

because he was terminated for breaking the same rules as Jason Griffin, an African-American

maintenance manager at Victory, who was neither disciplined nor terminated for identical

actions.  (SUF ¶ 74.)  Mr. Boice testified that work orders note that Mr. Griffin had outbound

delays and that both men released buses without proper wheelchair lift maintenance and failed to

enter notes into VMIS.  (Pl. Facts ¶¶ 75,77.)  Mr. Boice also testified that a witness, Carl Veuno,

could testify that Mr. Griffin sent buses needing safety repairs into public use.  (Ex. D to Mot.

-15-

for Summ. J., Boice Dep. 136) All of this evidence is hearsay as presented and inadmissable as evidence during summary judgment. Fed. R. Civ. P. 56(e).

Mr. Boice's comparison to Mr. Griffin is not bolstered by his claim that Mr. Griffin released "hold" buses. Mr. Boice contends that he was a percipient witness to this alleged transgression, so his testimony should suffice as evidence. (Transcript of Oral Argument Mot. for Summ. J. at 21.) On this point, Mr. Boice had merely testified that "[t]here isn't a foreman, manager anywhere in SEPTA who has not sent out a hold bus." (Pl. Facts ¶ 76).This testimony is conclusory and does not explain how Mr. Boice could personally have witnessed Mr. Griffin's violation of the policy. See Embry v. Fleckenstein, No. 95-5897, 1996 U.S. Dist. LEXIS 17157, at *10 (E.D. Pa. Nov. 14, 1996) (holding when affidavits do not provide the basis for the affiant's knowledge of the disparate treatment, the affidavits will not be sufficient evidence to survive summary judgment).

Finally, Mr. Boice testified that "a wheel fell off of a bus Mr. Griffin sent out, which is evidence that Mr. Griffin failed to do wheel torques."  (Pl. Facts ¶ 98.)  Even if Mr. Boice had witnessed this incident and even if Mr. Boice's inference that Mr. Griffin was not disciplined was logical and appropriate, this single incident of misconduct fails to form a sufficient basis of comparison between Messrs. Boice and Griffin. Preferential treatment of a similarly situated colleague of a different race may serve to suggest racial discrimination occurred. However, the similarly situated employee should be guilty of violating the same policy for which the plaintiff was punished. Goosby, 228 F.3d at 322;  Campetti v. Career Educ. Corp., No. 02-1349, 2003 U.S. Dist. LEXIS 12202, *24 (E.D. Pa. June 25, 2003). In this case,  Mr. Boice does not allege that Mr. Griffin committed all of the same infractions for which he himself was fired. He does not allege Mr. Griffin failed to follow SEPTA's policy to contact other bus depots in order to

ensure there were no delays. (Ex. D to Mot. for Summ. J., Boice Dep. 135-36.) He does not

contend Mr. Griffin ever reprimanded a peer manager in front of others at SEPTA.  (Ex. D to

Mot. for Summ. J., Boice Dep. 137.)  As mentioned, Mr. Boice presents no evidence beyond his

own speculative testimony and inadmissible hearsay to support his contention that Mr. Griffin

released buses needing repairs, had outbound delays, or failed to follow SEPTA's ADA policy.

Mr. Boice cannot prove he would have been aware of differing discipline standards even if Mr.

Griffin did commit any of the above violations. Mr. Boice claims he would have known about

discipline by virtue of his position as a union representative. (Pl. Response at 5.)  However, Mr.

Boice admitted in his deposition he might not have been aware of all disciplinary action due to

discrepancies in reporting discipline to the union. (Ex. D to Mot. for Summ. J., Boice Dep. 68,

70.)  Of course, it is not unreasonable to think that SEPTA may have disciplined Mr. Griffin, but

Mr. Boice was unaware that such discipline would have been administered.[16]

Mr. Boice simply does not have sufficient evidence to suggest disparate treatment existed

based upon any racial animus. Mr. Boice relies upon  Jackson v. University of Pittsburgh, 826

F.2d 230, 235-36 (3d Cir. 1987) for the proposition that his testimony alleging disparate

treatment suggests an inference of discrimination. In Jackson, the plaintiff's testimony raised the

issue of whether the employer's reason for dismissal was pretext. The plaintiff alleged that he

---

[16]The deposition testimony actually suggests the appropriate question is not whether Mr. Griffin
was disciplined, but whether he committed such infractions in the first place. Mr. Hilsee and
Mr. Bolduc, who served as assistant directors at Victory and direct supervisors of both Mr. Boice
and Mr. Griffin, testified that they were not aware of any performance issues with Mr. Griffin.
(SUF ¶ 81, 83)  Similarly, Mr. Thornhill testified that he was not aware that Mr. Griffin had
committed any of the types of offenses for which Mr. Boice was discharged.  (SUF ¶ 84.) Mr.
Boice further testified that by virtue of SEPTA's internal controls, it would be impossible for
Mr. Thornhill to remain unaware that Mr. Griffin sent out "hold" buses or did not enter
wheelchair repairs into VMIS.  (Ex. D to Mot. for Summ. J., Boice Dep. 158-159.) Also, Mr.
Boice's admission that he may not have been aware of how discipline was administered
undercuts his argument that disparate treatment took place.

never received complaints regarding his work, thus challenging the employer's given reason for dismissal. In Jackson, the plaintiff would have been a percipient witness to failing to receive such complaints. Id. (holding that a plaintiff's lengthy, detailed deposition, standing alone,  may be enough to create a genuine issue as to whether race discrimination existed).  In Jackson, the plaintiff's testimony led to a genuine issue of material fact as to whether the plaintiff had a good work record, so it called into question the employer's rationale for the adverse action. See 826 F.2d at 235-36.   Here, Mr. Boice provides no evidence to rebut SEPTA's extensive documentation of his notable disciplinary record.  His assembled evidence of supposed racial discrimination would not allow a fact-finder to rationally decide that discrimination was more likely than not the motivating factor in his dismissal.

In addition, this case can be distinguished from Jackson because Mr. Boice's testimony about Mr. Griffin's infractions is inadmissable. His testimony relies on work orders and second-hand allegations from an absent, merely potential witness.  Such testimony is hearsay and inadmissible at the summary judgment stage. Fed. R. Civ. P. 56(e). As a result, Mr. Boice has presented no admissible evidence that Mr. Griffin committed parallel infractions. Thus he fails to show he was treated less favorably than a colleague of a different race who committed similar violations. Indeed, Mr. Boice's case more closely resembles Davis v. City of Phila., 57 F. App'x. 90, 91 (3d Cir. 2003), in which the Third Circuit Court of Appeals held that because the evidence failed to demonstrate that the compared individuals committed the same violations, the plaintiff failed to show an inference of discrimination. Id.

Past incidents of discrimination may be admissible in order to consider whether the plaintiff has raised an inference of discrimination. See Sempier v. Johnson & Higgins, 45 F.3d 724, 730, n5 (3d Cir. 1994); cert. denied 55 U.S. 1199 (1995); see also Brethwaite v. Cincinnati

<u>Milacron Marketing Co.</u>, No. 94-3641, 1995 U.S. Dist. LEXIS 12200, at*9-10 (E.D. Pa. Aug. 21, 1995).  Therefore, Mr. Boice calls upon events other than those which took place in the summer of 2003.  Mr. Boice claims additional instances of adverse employment action in an attempt to show a general history of "reverse" racial discrimination at SEPTA:

1.    In 1996 or 1997, Emille Williams, the director of maintenance at the Courtland facility, who is African-American, told Mr. Boice not to talk to Mr. Thornhill's wife, after she allegedly filed an internal complaint against Mr. Boice for race discrimination.

2.    In 1996 or 1997, Mr. Boice found Mr. Thornhill sleeping on the job but was told by Mr. Williams not to take any action.

3.    In 1998, Plaintiff was transferred from Courtland to the Comly facility after he filed an internal complaint against his supervisor, Larry Moore, who is African-American.

4.    In 2000, Joe Brennan, the superintendent at Callowhill, who is Caucasian, imposed a fifteen-day suspension on Mr. Boice after Mr. Thornhill submitted  written documentation that Mr. Boice was failing to appropriately manage the employees under his supervision.  (SUF ¶ 26.)

5.    In October or November of 2002, Mr. Boice testified on behalf of Kwana Woods, a co-worker, who claimed gender discrimination.  He claims that another co-worker told him that his testimony was "career suicide," and he believes that since that time, Mr. Thornhill has been "gunning" for him.

6.    In December 2002, Mr. Boice was suspended for four days by Mr. Thornhill, after his supervisor, Mr. Hilsee, who is Caucasian, wrote him

up for not completing "wheel torques." Jason Griffin allegedly avoided a

write-up, although Mr. Boice claims that he, too, did not perform wheel

torques.[17]

(SUF ¶ 95.)

Insofar as the events listed above might be used to support an inference of discrimination,

these events do not bolster Mr. Boice's own testimonial evidence sufficiently to prove that

SEPTA operated with an underlying motive of racial discrimination.[18] In employment

discrimination cases, the actions of the decision-makers and the incidents surrounding the

termination are of primary concern. Ezold v. Wolf, Block, Schorr, & Solis-Cohen, 983 F.2d 509,

545 (3d Cir. 1992) ("Stray remarks by non-decision makers . . . are rarely given great weight,

particularly if they were made temporally remote to the date of decision."). The various incidents

cited by Mr. Boice happened as long as ten years ago and involved numerous individuals, most

of whom were not privy to the decision to dismiss him. Indeed, Mr. Boice even admits that the

instruction not to report Mr. Thornhill for sleeping was not motivated by racial animus. (Ex. D to

[17]As mentioned above, Mr. Boice's evidence that Mr. Griffin did not do his wheel torques consists of Mr. Boice's testimony that during Mr. Griffin's shift, a wheel fell off of a bus, and to his knowledge Mr. Griffin was not written up for failing in his job duty.  (SUF ¶ 98.)

[18]To the extent that Mr. Boice testifies to these events as separate and distinct  adverse employment actions, SEPTA argues that these allegations are time-barred, because Mr. Boice filed his charge with the EEOC, on October 14, 2003, more than 300 days after each such incident had occurred.  See 42 U.S.C. § 2000e-5(e).  However, it does not appear that Mr. Boice attempts to assert independent claims, or more specifically, independent and separate adverse employment actions, based on these events.  Instead, Mr. Boice seeks to present these events as evidence of the discriminatory character of his later termination.  (Pl.'s Br. 5 n.1.) He may present this evidence as long as he does not argue that each incident, or the time-barred incidents as an aggregate, would establish an independent basis for finding that his termination was discriminatory.  Brethwaite, 1995 U.S. Dist. LEXIS 12200 at*9-10 ("the Third Circuit has approved the use of pre-limitations period events as evidence of discrimination with regard to post-limitations period actions").

Mot. for Summ. J., Boice Dep. 61.) Only the last incident, involving a supposed instance of disparate treatment, could possibly suggest an inference of racial animus, but Mr. Boice has submitted no admissible evidence that Mr. Griffin committed the wheel-torque violation and was not punished. Therefore, these alleged events would not allow a reasonable fact-finder to infer racial discrimination by SEPTA against Mr. Boice.

 To further undermine Mr. Boice's claim of racial discrimination, SEPTA points to two facts: (1) that several individuals who made the final decision to terminate Mr. Boice are Caucasian; and (2) that SEPTA replaced Mr. Boice with a Caucasian male.

 Evidence that the person who made the final decision to terminate a particular plaintiff was the same race as the plaintiff undercuts any inference of discrimination. Coulton , 2006 WL 759701 at *6 (citing Turgeon v. Marriott Hotel Svcs. Inc., 2000 WL 1887532 at *8 (E.D. Pa. Dec. 27, 2000)).[19]  In this case, there is no dispute that the main participants in the decision to terminate Mr. Boice were Caucasian. This group included Mr. Bolduc, Mr. Boice's former direct supervisor at Victory; James Hathaway, the chief officer presiding over Mr. Boice's grievance hearing; and James Jamison, the manager of labor relations. Mr. Bolduc conducted the performance discussion with Mr. Boice in July 2003, discovered the A cards in his locker, drafted the Imminent Discharge letter, and reported Mr. Boice's infractions to Mr. Thornhill. (SUF ¶ 37-42.)   James Jamison finalized Mr. Boice's termination by denying his grievance.  To be sure, Mr. Thornhill participated in the decision to terminate Plaintiff by recommending that he be disciplined. (Ex. B to Mot. for Summ. J., Thornhill Dep. 112). However, Mr. Thornhill

---

[19] If a participant in the termination was a member of a different race, this information may be useful in creating an inference of racial discrimination, though such a factor alone is insufficient to establish a *prima facie* case. Barbee v. Southeastern Pennsylvania Transporation Auth., 2006 U.S. Dist. LEXIS 50314 at * 16 (E.D. Pa. Jul. 24, 2006); Iadimarco, 190 F.3d at 156 (internal quotations omitted).

neither instigated the series of investigations which led to Mr. Boice's termination, nor did he make the final decision to fire Mr. Boice. Taken as a whole, the racial composition of the decision-making group seriously hampers Mr. Boice's racial discrimination claim.

In addition to the significance of the racial make-up of a plaintiff's detractors, the replacement of a plaintiff with someone of the same race likewise undercuts a claim of racial discrimination.  See, e.g., Coulton, 2006 WL 759701, at *6. Hence, Mr. Boice's allegations that his termination was based on his race are undermined by the undisputed fact that the very same individuals who terminated Mr. Boice hired a Caucasian man to fill his position.   Finally, Mr. Boice ignores the fact that Mr. Thornhill expressly requested that Mr. Boice come to work for him at Victory shortly before his termination.  (Ex. B to Mot. for Summ. J., Thornhill Dep. 107.) Such evidence is consistent with case law holding that an employer's decision to hire an employee shortly before he was terminated can be evidence of a lack of racial animus even though it "should not be afforded any presumptive value." Walden v. SL Indus., Inc., 56 F.3d 491, 496 n.6 (3d Cir. 1995).

**ii.    SEPTA's articulated reasons for termination were not a pretext for discrimination**

SEPTA has proffered sufficient evidence to meet its burden of production by articulating a legitimate, nondiscriminatory reason for adverse employment action. See Burdine, 450 U.S. at 252-253.  SEPTA contends that it terminated Mr. Boice due to a number of serious disciplinary infractions, including releasing into service buses that needed safety-sensitive repairs.  (SUF ¶ 38-42.) SEPTA has submitted testimonial and documentary evidence to support its position that

Mr. Boice was terminated due to a long history of infractions, including particularly egregious violations of safety protocol in the months immediately before his termination.

Even if Mr. Boice did establish a *prima facie* case of racial discrimination, he has failed to show that the articulated reasons for his termination are a pretext for discrimination.  He has not demonstrated implausibility, inconsistency, incoherency or contradiction in SEPTA's proffered non-discriminatory reason for termination, such that a reasonable fact finder could either (1) disbelieve SEPTA's reason for termination, or (2) believe that unlawful discrimination was more likely than not the reason for the discharge.  Fuentes, 32 F.3d at 764-765.

Without denying his disciplinary infractions, Mr. Boice argues that SEPTA's proffered reasons for his termination (SUF ¶¶ 51-57) are pretext for discrimination because SEPTA is merely trying to rely on the arbitrator's findings of fact regarding Mr. Boice's violations. (Pl.'s Br. 7.)  While an arbitrator's decision does not bind the Court, the decision may be afforded significant weight, particularly where the decision gives full consideration to an employee's statutory or constitutional rights.  See McDonald v. City of West Branch, 466 U.S. 284, 292 n.13 (1984) (finding that an arbitral determination of fact deserves great weight in the context of an action brought under 42 U.S.C. § 1983).  Moreover, SEPTA does not rely solely on the arbitrator's decision to justify the discharge of Mr. Boice. SEPTA has filled the record with performance reports, testimony, and letters that document the infractions leading to Mr. Boice's termination. (Exs. to Mot. for Summ. J.B-T.)

In essence, Mr. Boice relies on his claim of disparate treatment as evidence that SEPTA's articulated reasons for dismissal are pretextual. While plaintiff need not provide additional evidence to rebut an employer's proffered reasons for an adverse employment action, evidence previously used to establish a *prima facie* case must be sufficient to satisfy the "more stringent

question of whether the evidence is sufficient to establish pretext, rather than whether the evidence is sufficient to establish an inference of discrimination." Taylor v. Proctor & Gamble Dover Wipes, 184 F.Supp.2d 402, 414 (D. De. 2002).

 Mr. Boice has failed to point to any record fact to show sufficient inconsistencies or anomalies to support an inference that SEPTA did not act for its stated reasons and based upon Mr. Boice's lengthy and serious disciplinary record. In sum, Mr. Boice's evidence of disparate treatment is not sufficient to rebut SEPTA's proffered, non-discriminatory reason for discharge.

### C.    Mr. Boice's Claims Under the ADA and the PHRA[20]

Mr. Boice also makes claims that SEPTA violated the ADA by failing to accommodate his disabilities, which include diabetes and a shrapnel wound. (SUF ¶ 113.)  Specifically, Mr. Boice claims that SEPTA (1) refused his request to remain on a day shift, rather than be switched to a relief shift, in order to regulate his diabetes medication (SUF ¶ 100); and (2) refused his request to allow him to park closer to the maintenance facility or be given access to a handicapped parking space. Id.

To qualify for relief under the ADA, an employee must demonstrate that (1) he is an individual with a disability; (2) he is otherwise qualified, with or without reasonable accommodation, to perform the essential functions of the job; and (3) he has suffered an adverse employment action as a result of his disability.  Taylor v. Phoenixville School Dist., 184 F.3d 296 (3d Cir. 1999) (citations omitted). Under the ADA, a plaintiff may pursue a claim for disparate treatment or for a failure to accommodate. A claim for disparate treatment is analyzed under the

---

[20] The Court will treat Mr. Boice's PHRA claim as coextensive with his ADA claim. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

McDonnell Douglas burden shifting test discussed above. However, the burden-shifting test does not apply to claims for failure to accommodate. Ferreri v. Mac Motors, Inc., 138 F.Supp. 2d 645, 651 n1 (E.D.Pa. 2001) ("In a failure to accommodate claim, however, the McDonnell Douglas test does not apply. Once a plaintiff alleges facts that, if proven, would show that an employer should have reasonably accommodated an employee's disability and failed to, the employer has discriminated against the employee.")

Failure to accommodate an employee's disability is itself evidence of discrimination under the ADA. See 42 U.S.C. § 12112(b)(5). There is no need in such a case for indirect proof of discrimination. Walton v. Mental Health Ass'n of Southeastern Pa., No. 96-5682, 1997 WL 717053, at *10 (E.D.Pa. Nov. 17, 1997), aff'd, 168 F.3d 661 (3d Cir. 1999). In order to establish a prima facie case for failure to accomodate, Mr. Boice must show that: "(1) he had a disability; (2) the employer had notice of this disability; (3) he can perform the essential functions of his position with a reasonable accommodation; and (4) the employer failed to provide an accommodation." Johnson, 451 F.Supp.2d at 700.

To qualify for recovery under the ADA, Mr. Boice must have a disability which impaired a major life activity during employment. Marinelli v. City of Erie, Pa., 216 F.3d 354, 359 (3d Cir. 2000). Mr. Boice has alleged he has diabetes and a shrapnel wound, which substantially limit his major life activities such as walking and caring for himself. (Pl. Response at 11). For the purposes of this motion, SEPTA has assumed that Mr. Boice is a qualified individual who performed the essential functions of his job for 14 years and who has a qualifying disability.[21]

---

[21]SEPTA limits this assumption to Mr. Boice's impotence induced by his diabetes medication. Mr. Boice testified that his impotence is the only disabilty that impairs a major life activity. "Reproduction and sexual activity have . . . been recognized as major life activities." Reese v. American Food Service, No. 99-1741, 2000 U.S. Dist. LEXIS 14343 (E.D. Pa. 2000). He also testified that as of 2003 or 2004, after his termination from SEPTA, he was diagnosed with

Viewing the facts in a light most favorable to Mr. Boice, the Court assumes for the purposes of this motion that Mr. Boice has demonstrated he has a disability which interferes with a major life activity. The inquiry, then, moves to whether Mr. Boice cannot establish that SEPTA failed to accommodate his disability. SEPTA argues that he cannot do so because he never requested an accommodation and, therefore, never made SEPTA aware of his need for an accommodation.

## I.        Request for an Accommodation

Under the ADA, an employee must make an initial request for an accommodation in order to trigger an employer's obligation to participate in the interactive process of designing a reasonable accommodation for the employee's disability. An employee does not need to mention the ADA or the phrase "reasonable accommodation" in his request, but must only make a request in "plain English." Taylor, 184 F.3d at 313. The employer's duty to engage in the interactive process commences once the employee has provided information that "the employer can be fairly said to know of both the disability and desire for accommodation." Taylor, 184 F.3d at 313. Once the request is made, an employer has a duty to engage in the accommodation process. Cobb v. Phila.Gas Works, 118 Fed.Appx. 584, 586, (3d Cir. 2004) ("Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312 (3d Cir.1999)...made clear that under the ADA an employer has a duty to participate in an interactive process to determine appropriate accommodations once an employee has provided notice of a disability and a request for accommodation.").

SEPTA argues that Mr. Boice has failed as a matter of law to show that he requested an accommodation.  A short time after Mr. Boice began work at Victory, Mr. Thornhill informed all

_____

diabetic neuropathy and suffered from sciatica caused by his shrapnel wound. (Ex. D to Mot. for Summ. J., Boice Dep. 191-195.)  SEPTA denies being aware that Mr. Boice had a disability due to his shrapnel wound during his employment. (Reply Brief in Support of Mot. for Summ. J.at 11).

of the maintenance managers that they could no longer park in the alley between the two

buildings that comprised their "shop" since it interfered with the mechanics' ability to access tires

stored in the alley.  (Ex. B to Mot. for Summ. J., Thornhill Dep. 23; Ex. Y to Mot. for Summ. J.,

Griffin Dep. 37.) Mr. Boice allegedly personally suffered as a result of this decision, and he asked

for parking in close proximity to the building.

     Mr Boice testified:

> Q:    Other than your termination in August of 2003, are there
> any other actions that you believe were discriminatory?
> A:    About the parking with Eric.
> Q:    What is it about the parking with Eric?
> A:    Well, I have handicapped tags on my car and I used to park
> close to the shop because that was the only parking spot
> when I came in and he told me that I couldn't park there and
> I said, "Well I need a handicapped spot," and he said,
> "There is none."

(Ex. D to Mot. for Summ. J., Boice Dep. 40-41.)

     Later in his deposition, Mr. Boice continued:

> Q:    You testified a moment ago that you never requested an
> accommodation.
> A:    Yes.
> Q:    Why was that?
> A:    Because I didn't need an accommodation.
> Q:    Did you ever consider the fact that you testified that you
> needed to park close to the shop an accommodation?
> A:    No.  I just asked them where the handicapped spot was and
> why was he making me move and no one else.

Id. at 150-151.  Mr. Boice additionally acknowledged that he was aware that SEPTA had

procedures for requesting an accommodation for a disability, and that while he knew how to

engage these processes, he did not do so.

     As to his shift change, Mr. Boice communicated a clearer request to Mr. Thornhill and to

Mr. Hilsee.  Mr Boice testified:

> Q:    Did you tell Mr. Thornhill that you wanted to be on a steady
>       shift because of your diabetes?
> A:    Yes.
> Q:    What did you say?
> A:    When I explained to him the deal about with Mr. Hilsee,
>       that it had to do with my diabetes, he said, you know, he
>       didn't care about that.
> ****************************************************
> A:    I told Mr. Hilsee that I needed to be on [one permanent
>       shift] because of my diabetes.

Id. at 49, 53.

However, Mr. Boice also testified during his deposition that he did not consider the

request to avoid a relief shift as a request for an accommodation.  Id. at 150-151.  Mr. Thornhill

testified that he was fully aware that Mr. Boice was a diabetic, but was unaware that his diabetes

posed a problem for him at work.  (Ex. B to Mot. for Summ. J., Thornhill Dep. 22-23.)

SEPTA would hold Mr. Boice to his testimony that he did not consider, nor did he ask for

an official "accommodation." Mr. Boice argues these informal requests for accommodation were

sufficient to trigger SEPTA's responsibility for an interactive process.

As outlined above, Mr. Boice arguably contradicted himself during his deposition

testimony regarding whether he asked for an accommodation. On one hand, he stated that he

requested a parking spot and shift change for his disability. On the other hand, he said he did not

consider these requests to be requests for accommodation. SEPTA relies upon Martin v. Merrel

Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) and Hackman v. Valley Fair, 932

F.2d 239, 241 (3d Cir. 1991), to argue that the Court should ignore averments which contradict

Mr. Boice's assertions that he did not ask for an accommodation. However, SEPTA itself ignores

the distinction that Mr. Boice did not submit affidavits after his deposition to contradict this

testimony as was the circumstance in Martin, but instead may here contradicted himself within

his deposition testimony. When a witness's overall deposition testimony is unclear, the Third

Circuit has resisted following SEPTA's preferred reasoning. See Videon Chevrolet v. General Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993) (finding Martin "inapposite" when deposition testimony was ambiguous).

In light of the Third Circuit's ruling that a request for accommodation may be made in "plain English," Mr. Boice did not need to precisely articulate his request as an "accommodation" as long as he communicated a need for what would amount to an accommodation.  Mr. Thornhill has admitted that he knew Mr. Boice suffered from diabetes. Mr. Boice claims to have specified that he needed to be on a certain shift as a result of his diabetes, and he explicitly requested a handicapped parking spot. Even if Mr. Boice did not follow SEPTA's formal procedures for requesting an accommodation, it appears on the record that there is a genuine issue as to whether Mr. Boice communicated his disability and desire for an accommodation to SEPTA. See Eisfelder v. Department of Natural Resources, 847 F.Supp. 78, 84 n3 (W.D. Mich. 1993) (noting "defendants have cited no legal support for their contention that plaintiff's failure to follow formal accommodation procedure eliminates her protection under the ADA"); see also Shapiro v. Township of Lakewood, 292 F.3d 356, 361 (3d Cir. 2002) (holding that in an ADA failure to transfer case, summary judgment was inappropriate when employee did not make a formal accommodation request but fulfilled the standard prescribed by controlling case law).

If proven, Mr. Boice's requests, combined with Mr. Thornhill's knowledge of his diabetes, triggered the employer's duty to engage in the interactive process. Taylor, 184 F.3d at 313. Mr. Thornhill's alleged response in both instances would fall far short of the interactive process specified by Taylor. 184 F.3d at 315 ("Once the employer knows of the disability and the desire for accommodations, it makes sense to place the burden upon the employer to request additional information the employer believes it needs."). Because Mr. Boice presents a genuine

dispute as to SEPTA's good faith participation in the interactive process, the Court certainly could not conclude that no reasonable accommodations were possible or that Mr. Boice was successfully accommodated. <u>Taylor</u>, 184 F.3d at 318. Thus, there is a genuine issue of material face as to whether SEPTA failed to accommodate Mr. Boice's known disability and thus violated the ADA.

### ii.    Adverse Employment Action

SEPTA contends that Mr. Boice suffered no adverse employment action as a result of his disability. Mr. Boice concedes that he was not terminated as a result of his disability, but still alleges that SEPTA's failure to accommodate constitutes discrimination under the ADA.[22] (Pl. Response at 12.) The Court of Appeals for the Third Circuit has stated that in order to recover under the ADA, a plaintiff must have suffered an adverse employment action. <u>Collins v. Prudential Inv. & Ret. Services</u>, 119 Fed. App'x 371, 373-74 (3d Cir. 2005); <u>Taylor v. Phoenixville School Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999); <u>Gaul v. Lucent Techs.</u>, 134 F.3d 576, 579-80 (3d Cir. 1997); <u>but</u> <u>see</u> <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000) (specifying the need for an adverse employment action in disparate treatment cases).  However, in failure to accommodate cases,  "[a]n adverse employment decision includes the employer's failure to accommodate, reasonably, the employee's disability." <u>Reifer v. Colonial Intermediate Unit 20</u>, 462 F.Supp.2d 621, 634 (M.D. Pa. 2006); <u>see also</u> <u>Williams v. Philadelphia Housing Authority Police Dept.</u>, 380 F.3d 751, 761 (3d Cir. 2004). Therefore, giving Mr. Boice the benefit

---

[22]According to the ADA, "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring advancement or discharge of such employees, employee compensation, job training, and other terms, conditions and privileges of employment."  42 USCS § 12112 (a). An employer "discriminates" by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 USCS § 12112 (b)(5)(A).

of a liberal reading of his complaint and his deposition, Mr. Boice has asserted facts that, if proven, could show that SEPTA failed to make reasonable accommodations for his disability causing Mr. Boice to suffer an adverse employment action in terms of the "conditions and privileges of employment."[23]

In this case, viewing the evidence in the light most favorable to Mr. Boice, there is an issue of material fact as to whether SEPTA failed to engage in the interactive process and accommodate Mr. Boice's disability, at least during the time period when he was relegated to the relief shift and/or denied a near-in parking place.[24]

### D.   Damages

SEPTA argues that Mr. Boice's claims for damages are limited.  First, SEPTA contends that it is immune from punitive damage liability pursuant to Title VII and § 1981.  SEPTA is correct, and Plaintiff concedes this point.  See, e.g., Bolden v. SEPTA, 953 F.2d 807, 830 (3d Cir. 1991) (SEPTA is immune from punitive damage liability); Poli, 1998 WL 405052, at *14 (SEPTA is immune from punitive damages under Title VII, and §§1981, 1983 and 1985); Allstate Transportation Co., Inc. V. SEPTA, 1998 WL 67550, at *5 (E.D. Pa. Feb. 13, 1998) (SEPTA is immune from punitive damages as a state actor).

---

[23] SEPTA argues that it should be granted summary judgment because Mr. Boice has proffered no evidence that the discrimination (failure to accommodate) was motivated by the disability. (Reply Brief in Support of Mot. for Summ. J.at 7). However, Mr. Boice has established a *prima facie* failure to accommodate case as prescribed by Taylor. Also, our court of appeals urges caution in granting an employer summary judgment in discrimination cases when intent is at issue. See Goosby v. Johnson & Johnson Med. Inc., 228 F.3d 313, 321 (3d Cir. 2000).

[24]While Mr. Boice alleged retaliation under the ADA in his Complaint, he does not discuss any alleged retaliation in his Response to the Summary Judgment Motion. (Pl. Response at 12.) In any case, there is no evidence of causal connection between Mr. Boice's dismissal and his disability, so no reasonable jury could infer a causal link. See Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751, 761 (3d Cir. 2004).

Next, SEPTA argues that Mr. Boice's claims for lost wages from the date of his discharge to the date of his possible favorable verdict are limited by his receipt of disability benefits. SEPTA contends that Mr. Boice is not entitled to these lost wages or reinstatement since the Veterans' Administration designated him 100% disabled as of the date of his last day of work. In Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806 (1999), the Supreme Court held that a plaintiff's sworn assertion in an application for disability benefits that he is unable to work will appear to negate an essential element of his ADA case, namely, that he is a qualified person with a disability who "with or without reasonable accommodation, can perform the essential functions of his job."[25] The Supreme Court concluded that a plaintiff may not simply ignore contradictions within applications for disability benefits and an ADA claim. Rather, he must supply a sufficient explanation to reconcile why in one instance he claimed to be unable to work, but he asserted in his ADA claim that he can perform the essential functions of the job with or without reasonable accommodation. Id. at 806. If a plaintiff does not explain the contradiction, he may be judicially estopped from pursuing an action for disability discrimination. See Dodaro v. Acme Markets, No. 06-0387, U.S. Dist. LEXIS 89756 at *11 (D.N.J. Dec. 11, 2006).

Mr. Boice has failed to explain the contradictions in his various statements about his disability. In response to SEPTA's contention that he is not entitled to lost wages from the date the VA designated him 100% disabled (which coincides precisely with his last day with SEPTA), Mr. Boice merely reasserts that if SEPTA provided reasonable accommodations for his disability,

---

[25]Moreover, the Supreme Court noted that lower courts have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (for example, by filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity. Cleveland, 526 U.S. at 806.

he would be able to perform his job there.  However, in order to receive disability benefits, he has stated unequivocally that he could not work at all. Mr. Boice has not explained the discrepancy between his application for disability benefits and his claim that he could perform the essential functions of the job. Thus, Mr. Boice is estopped from claiming that he is qualified to perform the functions of the job during the period he has received disability benefits, and, correspondingly, regardless of the outcome of the remaining issue in this case, Mr. Boice is not entitled to reinstatement or any lost wages from the date of his discharge.

**IV.     CONCLUSION**

For the foregoing reasons, Mr. Boice has adduced insufficient evidence to assert a *prima facie* case of race discrimination or, even if he had met that burden, to rebut the proffered non-racially discriminatory reasons for his dismissal.  The Court finds that Mr. Boice has asserted an at least minimally *prima facie* case of disability discrimination, but is not eligible for punitive damages, reinstatement or damages from the date of his termination from SEPTA.

An appropriate Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

-33-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUCE BOICE, | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | |
| TRANSPORTATION AUTHORITY, | : | NO. 05-4772 |
| | : | |
| Defendant. | : | |

## ORDER

AND NOW, this 5th day of October, 2007, upon consideration of Defendant SEPTA's Motion for Summary Judgment (Docket No. 12) and the responses thereto, it is hereby ORDERED that:

1. Defendant SEPTA's Motion for Summary Judgment (Docket No. 12) is GRANTED as to the alleged racial discrimination in Counts I, II, and IV of Mr. Boice's Complaint;

2. Defendant SEPTA's Motion for Summary Judgment (Docket No. 12) is DENIED as to the alleged disability discrimination in Counts III and IV of Mr. Boice's Complaint.

3. Defendant SEPTA's Motion for Summary Judgment with respect to its non-exposure to punitive damages is GRANTED.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

-34-